**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BRAD LIEBERMAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 10 C 2570 |
| | ) | |
| ALFREDA KIRBY,[1] Facility Director, | ) | |
| Rushville Treatment and Detention | ) | |
| Facility, Illinois Department of Human | ) | |
| Services, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE,[2] District Court Judge:

Petitioner Brad Lieberman, a convicted sex offender, is civilly committed to the custody of Respondent Alfreda Kirby, Director of the Rushville Treatment and Detention Facility of the Illinois Department of Human Services. In this action, Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. §§ 2241 and 2254 on the basis that his confinement violates his constitutional rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and the Ex Post Facto Clause of the United States Constitution. (R. 1, Pet. for Writ of Habeas Corpus ("Pet.") at 9-19.) For the reasons that follow, the Court denies Petitioner's application for a writ of habeas corpus.

---

[1] Alfreda Kirby replaced Larry Phillips as the Director of the Rushville Treatment and Detention Facility, where Lieberman is detained. The Court therefore substitutes Kirby as Respondent in this matter. *See* Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts; Fed. R. Civ. P. 25(d).

[2] The Executive Committee of the Northern District of Illinois reassigned this matter to the undersigned following the retirement of the Honorable Wayne R. Andersen.

## BACKGROUND

A federal habeas court sitting in review of a state court judgment pursuant to 28 U.S.C. § 2254 will "presume state factual findings to be correct, unless the petitioner rebuts the presumption by clear and convincing evidence." *Morgan v. Hardy*, — F.3d —, 2011 WL 5319665, at *4 (7th Cir. Nov. 7, 2011) (citing 28 U.S.C. § 2254(e)(1)); *Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005); *Wiggins v. Smith*, 539 U.S. 510, 528, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003); *Barrow v. Uchtman*, 398 F.3d 597, 603 (7th Cir. 2005)). "This presumption of correctness also applies to factual findings made by a state court of review based on the trial record." *Morgan*, 2011 WL 5319665, at *4 (citing, *inter alia*, *Sumner v. Mata*, 449 U.S. 539, 546-47, 101 S. Ct. 764, 66 L. Ed. 2d 722 (1981)). With these principles in mind, the Court turns to the relevant factual and procedural background, as found by the last state court to consider the merits of Petitioner's claims, the Illinois Court of Appeals. *See In re Detention of Lieberman*, 379 Ill. App. 3d 585, 586, 884 N.E.2d 160, 318 Ill. Dec. 605 (Ill. App. Ct. 2007).

In 1980, Petitioner was convicted in the Circuit Court of Cook County of six counts of rape and one count of attempted rape, and in the Circuit Court of Lake County of one count of rape and one count of attempted rape. *Id.* Petitioner was sentenced to multiple concurrent terms of imprisonment. After application of certain sentencing credits and adjustments, the State of Illinois (the "State") set a release date of January 9, 2000. *Id.*

Three days before Petitioner's scheduled release, the State filed a civil commitment petition pursuant to the Sexually Violent Persons Commitment Act ("SVPCA" or "Act"), 725

ILCS 207/1 *et seq.*[3] In its petition, the State alleged that Petitioner "had been convicted of a number of sexually violent offenses and was dangerous to others because his mental disorders created a substantial probability that he would engage in future acts of sexual violence." *In re Detention of Lieberman*, 379 Ill. App. 3d at 586. On February 10, 2005, following a hearing, the state trial court found that there was probable cause to conduct further proceedings on the State's petition and ordered that the Department of Human Services ("DHS") detain Petitioner pending a civil commitment trial. *Id.*

At trial, the State presented the testimony of two expert witnesses: Dr. Jacqueline Buck, a clinical psychologist and special evaluator for the state department of corrections ("DOC") and Dr. Barry Leavitt, a clinical psychologist who specializes in sexually violent persons ("SVP") evaluations. In addition to other witnesses, Petitioner presented the testimony of three experts: Dr. Fred Berlin, a psychologist and medical doctor who specializes in sexual disorders; Dr. Diane Lytton, a psychologist experienced in treating sex offenders; and Dr. Michael Fogel, a licensed clinical psychologist and director of the Illinois Sex Offender Evaluation Unit.

The State's first witness at trial was Dr. Jacqueline Buck. As the state appellate court found:

---

[3] The SVCPA authorizes the civil commitment of "sexually violent persons," 725 ILCS 207/40(a), a designation that includes an individual who has "been convicted of a sexually violent offense," and who "suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f); *see also Lieberman*, 505 F.3d at 667. The Act further defines "mental disorder" as a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/1(b). If the state proves, beyond a reasonable doubt, that an individual is a "sexually violent person," "that individual may be indefinitely committed 'until such time as the person is no longer a sexually violent person.'" *Davis v. Peters*, 566 F. Supp. 2d 790, 796 (N.D. Ill. 2008) (quoting 725 ILCS 207/35-40).

Dr. Buck testified that she conducted one two-hour interview with [Petitioner] in October 1999 and reviewed his master file as well as numerous other documents. Her review included psychological and psychiatric evaluations of [Petitioner], police reports, and other court documents provided by the DOC detailing the events that led to [Petitioner's] various convictions.  Based upon her review and evaluation, Dr. Buck believed that [Petitioner] was at a high risk to sexually reoffend if he was released into the community without treatment and, in October 1999, she prepared a report to that effect.  Dr. Buck updated her opinion every year thereafter and, although she did not conduct any additional interviews of [Petitioner] because he refused to speak with her, Dr. Buck did not believe that an additional interview was warranted because [Petitioner] refused to participate in sexual offender treatment. . . . [Dr. Buck] believed that [Petitioner] continued to be at a high risk to sexually reoffend.

Dr. Buck testified that, in forming her opinions, she relied upon [Petitioner's] criminal history and the facts from cases in which he was convicted of rape and cases in which he was arrested and charged with a sexually related offense. . . . In arriving at her opinions, Dr. Buck also considered evidence of [Petitioner's] behavior while he was incarcerated in the DOC and in the custody of the DHS. . . . [Petitioner] received disciplinary reports for his conduct[, including drug offenses].  [Petitioner] had his visiting privileges revoked after demonstrating inappropriate behavior with a female in the visitor's room . . . .While in the custody of the DHS, [Petitioner] exhibited "angry, hostile, aggressive behaviors" . . . and insisted that he was being illegally detained.  Dr. Buck also reviewed correspondence that [Petitioner] wrote to eight women over a period of approximately 10 months while he was incarcerated.  On one occasion, . . . . [Petitioner] wrote to a woman whose picture he had seen in the newspaper, stating "how beautiful" she was, "how sweet and how hot," and "how lucky he would be to have a friend like her." . . . .

Based upon all of these considerations, Dr. Buck diagnosed [Petitioner] with paraphilia not otherwise specified, sexually attracted to nonconsenting persons (paraphilia nos). Dr. Buck described the group of paraphilia disorders, which are contained in the Diagnostic and Statistical Manual of Mental Disorders (DSM), as essentially "sexually deviant behaviors," and testified that in this case, "we have what the law calls rape behavior, sexual assaults with nonconsenting women." Dr. Buck testified that the first criterion for paraphilia is that there be "intense recurring sexually arousing urges, fantasies or thoughts or behaviors which occur over at least a 6 month period of time," and that [Petitioner] met this criterion based on his multiple rapes committed over a 10-month period.  The second criterion for paraphilia nos is that these behaviors cause distress or impair [Petitioner's] ability to function socially in the workplace or society. [Petitioner's] detention in the DOC and DHS met this criterion, and Dr. Buck testified that [Petitioner] is "not able to be in society and function the way other

folks do." . . . .

. . . . Dr. Buck further explained that paraphilia nos is a "very deep-seeded problem" that requires intensive treatment and does not heal itself or go away while someone who suffers from it is in prison. Moreover, although the 15 mental health evaluations [Petitioner] underwent while incarcerated did not diagnose paraphilia, Dr. Buck was the first examiner to do a sex-offender-specific evaluation.

Dr. Buck also diagnosed [Petitioner] with cannabis abuse and antisocial and narcissistic personality disorders. Dr. Buck described antisocial personality disorder as "the disregard for and violation of the rights of others," and narcissistic personality disorder as someone who is "very grandiose" in thought or behavior, who requires admiration, and exhibits a lack of empathy.

Dr. Buck also conducted a risk assessment using four actuarial tools to determine [Petitioner's] risk of committing future acts of sexual violence. Specifically, Dr. Buck employed: (1) the Minnesota Sex Offender Screening Tool Revised (MnSOST-R); (2) the Static-99; (3) the Violence Risk Appraisal Guide (V-RAG); and (4) the Sex Offender Risk Appraisal Guide (SORAG). [Petitioner] scored "very high" under the MnSOST-R, "extremely high" under the Static-99, "high" under the V-RAG, and "extremely high" under the SORAG.

Dr. Buck stated that she looked for mitigating factors to consider in reaching her opinions. . . . . Dr. Buck testified that [Petitioner] has refused to participate in any [sex offender programs offered by DHS] and was therefore unable to find any mitigating factors. Dr. Buck also considered [Petitioner's] age and testified that, because he scored as a psychopath, [Petitioner] did not exhibit the usual pattern of decreased crime corresponding to increased age.

Dr. Buck concluded that in her opinion, within a reasonable degree of psychological certainty, [Petitioner] suffers from mental disorders that are both congenital and acquired, affect his emotional and volitional capacity, and predispose him to commit future acts of sexual violence. Based upon her clinical evaluation, review of [Petitioner's] files, [Petitioner's] lack of sex offender treatment, and the actuarial instruments she employed, Dr. Buck opined that it is substantially probable that [Petitioner] will continue to commit acts of sexual violence if released into the community.

On cross-examination, Dr. Buck testified that the Association for Treatment of Sexual Abusers (ATSA) recommends the use of multiple sources of information when making evaluations such as those in this case. . . . . According to Dr. Buck, . . . the original version of the [Minnesota Multiphasic Personality Inventory], which [Petitioner] took in 1986, is no longer recommended for clinical use and

was revised because it exaggerated individuals' mental health problems and generally over-diagnosed people with psychological problems. . . . .

According to Dr. Buck, [Petitioner] was evaluated by a psychologist and psychiatrist while incarcerated in 1989.  The psychologist did not diagnose [Petitioner] with paraphilia, cannabis abuse, or narcissistic and antisocial personality disorders, although Dr. Buck testified that these diagnoses were appropriate for these evaluations. . . . .

On cross-examination, Dr. Buck also testified that it was important for the results of actuarial instruments to be replicated by other psychologists before they are relied upon to determine if someone should be civilly committed.  Dr. Buck acknowledged[, among other things,] . . . that according to [an authoritative article], three of the four risk scales that she used on [Petitioner] do not predict the specific kind of recidivism that is at issue in this case . . . .

Dr. Buck also used a personality inventory called the Hare Psychopathy Checklist-Revised (PCL-R) to assess [Petitioner's] risk to recidivate and to substantiate her diagnoses of antisocial and narcissistic personality disorders. . . .

Dr. Buck testified under cross-examination that she made several errors in scoring [Petitioner's] actuarial results and that, according to Dr. Hanson, some of the risk factors upon which she relied could not be used to predict if a person will sexually reoffend.  Dr. Buck acknowledged that, according to a 2001 brief by the APA submitted in another case, substance abuse and personality disorders usually have little explanatory connection to an offender's sexual behavior.  Moreover, according to Dr. Hanson, offenders who denied their offenses are at no higher risk to recidivate than are other sexual offenders.

Dr. Buck further testified that [Petitioner] was assigned a primary therapist when he was placed in a DHS treatment and detention facility in 2000.  During that time, approximately 14 master treatment plans were prepared by [Petitioner's] primary therapist and other mental health staff.  Dr. Buck acknowledged that 12 of those treatment plans did not diagnose [Petitioner] with narcissistic personality disorder, although they did indicate narcissistic features, and that 11 of those plans did not diagnose [Petitioner] with cannabis abuse. . . .

Dr. Buck gave specific testimony on cross-examination regarding [Petitioner's] volitional control.  Dr. Buck testified that professionals in her field do not measure volitional control as "high, low, up, [or] down," and explained that she was not aware of any way of measuring volitional capacity.  Rather, according to Dr. Buck, [Petitioner's] mental disorders impact his emotional and volitional control by warping his perceptions and feelings, which allows him to exhibit sexually assaulting behavior.  Dr. Buck testified that [Petitioner] has volitional

control and capacity to do what he wants because he is not mentally ill, and that those without volitional control are mentally ill and include schizophrenics and manic-depressives who are not taking medication and are usually in a psychiatric hospital. Dr. Buck further testified that [Petitioner] committed the crimes intentionally and made a volitional choice to execute them, and that "all of [Petitioner's] behavior over the past well documented 26 years screams that he has volitional control, volitional capacity."

*Id.* at 586-93.

The State's second witness at trial was Dr. Barry Leavitt. As the state appellate court found:

Dr. Barry Leavitt is a clinical psychologist who specializes in [SVP] evaluations. Because [Petitioner] refused to be clinically interviewed, Dr. Leavitt conducted his evaluation by reviewing [Petitioner's] master file. According to Leavitt, an examination based solely on a review of available records is an acceptable method of conducting a [SVP] evaluation.

Dr. Leavitt testified that, in his expert opinion, [Petitioner] suffers from: (1) paraphilia nos; (2) antisocial personality disorder; (3) narcissistic personality disorder; and (4) cannabis abuse within a controlled environment. Dr. Leavitt explained that paraphilia was the primary predisposing condition that compelled [Petitioner] to commit sexually violent acts and that [Petitioner's] other disorders act as disinhibiting influences that make it easier for him to exhibit sexually violent behavior. Dr. Leavitt further testified that [Petitioner's] paraphilia is a congenital or acquired disorder that affects his volitional or emotional control and predisposes him to commit future acts of sexual violence. Dr. Leavitt explained that [Petitioner's] recurrent sexual behaviors were not simply impulse driven but, rather, highly planned and consistent with someone who is compelled to engage in sexually deviant behavior. Moreover, paraphilia cannot be cured but it can be controlled through treatment. Dr. Leavitt opined that, in his expert opinion, there is a substantial probability that [Petitioner] will commit future acts of sexual violence unless he participates in appropriate treatment.

. . . . According to Dr. Leavitt, [Petitioner] qualified for a diagnosis of paraphilia nos, which requires a recurrent pattern of sexual urges, fantasies or behaviors toward nonconsenting persons over a period of at least six months, because he was identified by 16 women as having or attempting to have committed sexually violent offenses against them and approximately half of those cases resulted in convictions. . . . .

Dr. Leavitt used actuarial instruments to conduct a risk assessment and measure

[Petitioner's] likelihood of reoffending. [Petitioner] fell into the "high risk" category under both the Static 99 and the MnSOST-R actuarial tools. Both instruments are viewed as providing an underestimate of someone's future likelihood of reoffending. [Petitioner's] results from these instruments served to confirm Dr. Leavitt's clinical judgment that it was substantially probable that [Petitioner] would commit future acts of sexual violence were he released into the community.

Dr. Leavitt also looked at additional "dynamic risk factors" that might serve to solidify, modify or aggravate the level of risk as determined by the actuarial instruments and the clinical impressions. . . . . Dr. Leavitt testified that based upon his clinical judgment and review of the actuarial result and risk factors, there is a high risk that [Petitioner] will sexually reoffend.

On cross-examination, Dr. Leavitt acknowledged that [professional rules] advise[] psychologists to discuss the limits of any conclusions that are not based on a personal interview. However, Dr. Leavitt testified that he complied with that requirement by disclosing that [Petitioner] refused to be interviewed and that his report was based on a review of available records. . . .

Dr. Leavitt also disagreed with a treatise indicating that paraphiliac fantasies and ritualized behavior need to be elicited in order to diagnose paraphilia, and believed that, instead, he needed evidence of sexually arousing fantasies, urges or sexual behaviors. . . .

*Id.* at 592-95.

Petitioner's first witness at trial was Dr. Fred Berlin. As the state appellate court found:

. . . Dr. Fred Berlin [is] a psychologist and medical doctor who specializes in sexual disorders. . . . Dr. Berlin testified that actuarial instruments, while helpful . . . , cannot accurately predict the likelihood that a particular individual will commit a future sexual offense. Dr. Berlin believed that clinical judgment was preferred over actuarial instruments [and] also characterized Dr. Buck's statements that the actuarial instruments placed [Petitioner] at an extremely high risk of sexually reoffending as misleading. Dr. Berlin acknowledged that neither Dr. Leavitt nor Dr. Buck used actuarial tools alone in arriving at his and her opinion in this case.

Petitioner's second witness at trial was Dr. Jacqueline Buck. As the state appellate court found:

Dr. Diane Lytton[,] a psychologist experienced in treating sex offenders, . . .

8

reviewed [Petitioner's] master file, Dr. Buck's and Dr. Leavitt's reports,[] Dr. Buck's deposition and trial testimony in this case[, and] interviewed [Petitioner] on three occasions . . . and interviewed several of his family members.

Dr. Lytton . . . testified that, in her expert opinion, [Petitioner] does not suffer from a mental disorder that affects his emotional and volitional control and predisposes him to commit acts of sexual violence, and that it was not substantially probable that [Petitioner] would commit a sexually violent offense in the future. Dr. Lytton opined that [Petitioner] did not have a mental disorder because his sexual offenses occurred 26 years ago, the majority of those who commit rape do not have mental disorders, and [Petitioner] does not currently have recurrent intense sexually arousing fantasies, urges or behaviors that would support a diagnosis of paraphilia. Dr. Lytton gave considerable weight to [Petitioner's] family and social upbringing[, which] . . . showed Dr. Lytton that [Petitioner] was very engaged with others socially, although she acknowledged that a person with antisocial and narcissistic personality disorders might also participate in these activities. . . . . Dr. Lytton also reviewed the 15 mental health evaluations compiled while [Petitioner] was incarcerated and opined that those evaluations, which did not diagnose paraphilia, narcissistic personality disorder or cannabis abuse, were inconsistent with the four disorders diagnosed by Dr. Buck and Dr. Leavitt.

Dr. Lytton also relied upon [Petitioner's] behavior while in prison[, noting that Petitioner] obtained his GED, . . . , and was allowed to travel to coed correctional centers for prison band performances. . . . Dr. Lytton testified that even though [Petitioner] was in a secure facility, it was nevertheless significant that he was allowed to be around women because sexual assaults can and do occur in a prison environment.

Dr. Lytton also reviewed approximately 33 letters of recommendation from prison guards, officers and wardens. . . . Dr. Lytton's review of these letters indicated that [Petitioner] followed most of the rules while incarcerated, that he was not aggressive, did not have anger control issues, was able to show empathy, and was a psychologically stable person. . . .

Dr. Lytton also explored [Petitioner's] attitudes toward women by interviewing him and reviewing his relations with his former wife and current fiancée and the unsolicited letters he sent to women while he was incarcerated. . . . Dr. Lytton concluded that [Petitioner] did not have sexually deviant fantasies or urges and gave no indication of sexually deviant behavior.

Dr. Lytton also testified that [Petitioner] did not suffer from cannabis abuse [and] . . . . did not have narcissistic personality disorder and found that he was able to empathize with and demonstrate concern and care for others. Finally, Dr. Lytton

opined that [Petitioner] did not have antisocial personality disorder[.]

Dr. Lytton further testified that, in her expert opinion, [Petitioner's] behavior demonstrated that he had volitional control. For example, [Petitioner] was given jobs while in prison that required him to work in secure areas and his sexual offenses were well planned out. In Dr. Lytton's expert opinion, [Petitioner] was not substantially probable to commit a future act of sexual violence. . . . Dr. Lytton testified that actuarial instruments were inappropriate to predict the risk that a person will sexually reoffend and that they do not account for the most dynamic risk factor-a person's age. [In Petitioner's] case, his age equated to a low risk of recidivism. Dr. Lytton explained that she relied upon two risk assessment instruments in concluding that [Petitioner] was not substantially probable to reoffend: the MnSOST-R and the PCL-R. Dr. Lytton reviewed Dr. Buck and Dr. Leavitt's MnSOST-R score for [Petitioner] and found the results and the opinions derived therefrom erroneous. . . . According to Dr. Lytton, the risk factors that Dr. Buck relied upon were either unsupported by research or not effective in predicting risk of sexual reoffending. . . . Based on Dr. Lytton's analysis of those risk factors, including [Petitioner's] age and the low base rate of recidivism for sexual offenders, she concluded that [Petitioner] was not substantially likely to commit a future act of sexual violence. . . .

Dr. Lytton acknowledged that 11 master treatment plans prepared since [Petitioner] was detained in a DHS treatment and detention facility in 2000 reflect a diagnosis of paraphilia nos. Those treatment plans began in January 2000 and continued intermittently through June 2005. Dr. Lytton testified that she did not know who made those diagnoses, but that Dr. Buck's name did not appear in those reports and that Dr. Buck did not sign them. Dr. Lytton also testified that the diagnoses in those plans were made after Dr. Buck's initial evaluation of [Petitioner] in 1999 and that they did not appear prior to that evaluation.

*Id.* at 592-97.

Petitioner's third witness at trial was Dr. Michael Fogel. As the state appellate court

found:

Dr. Michael Fogel is a licensed clinical psychologist who was the director of the Illinois Sex Offender Evaluation Unit from May 2003 to December 2005. In Dr. Fogel's opinion, actuarial instruments should not be used to evaluate sex offenders under the Act.

*Id.* at 597. Additionally, as the Illinois Appellate Court found, Petitioner "called several other

witnesses whose testimony established that [Petitioner] had contact with females during his

10

incarceration that did not produce any incidents." *Id.*

On February 6, 2006, a jury found that Petitioner was a SVP within the meaning of the Act. The trial court thereafter ordered Petitioner committed to DHS for "institutional care in a secure facility until further order of the court." *Id.* Petitioner appealed to the Illinois intermediate appellate court, arguing that the trial court erred: (1) in denying his request for judgment notwithstanding the verdict and immediate unconditional release because the State failed to prove the required SVP elements, including that he lacked volitional control; (2) in admitting evidence of his past crimes; (3) in excluding expert testimony; (4) in denying his motion for new a trial; (5) by ordering him committed to a secure facility; and (6) in denying his renewed motion to dismiss based upon a corrected release date.

On September 28, 2007, the Illinois Appellate Court, First District, affirmed. Petitioner thereafter sought leave to appeal to the Illinois Supreme Court, arguing that: (1) the federal and state constitutional due process clauses prohibit his commitment because the record showed that he did not lack volitional control; (2) the Circuit Court erred by admitting the past crimes evidence; and (3) the SVPCA is being applied retroactively in his case because when all sentencing credits are properly applied, his release date was well before the SVPCA's effective date. The Illinois Supreme Court denied leave to appeal on September 24, 2008. On December 22, 2008, Lieberman filed a petition for a writ of certiorari that the United States Supreme Court denied on April 27, 2009.

On April 26, 2010, Lieberman filed the present petition for a writ of habeas corpus pursuant to 28 U.S.C. §§ 2241, 2254, raising four claims for relief, namely that his civil confinement violates (1) his Fourteenth Amendment due process rights because the evidence at

trial showed that Petitioner does not lack volitional control; (2) the Ex Post Facto Clause of the

United States Constitution because his confinement was based on his past crimes; (3) his due

process rights because the actuarial tools used by the State's experts at trial were flawed; and (4)

the Due Process Clause and the Ex Post Facto Clause because the SVPCA was applied

retroactively.[4]  Respondent answered the petition on September 10, 2010, and Petitioner replied

on November 5, 2010.

The parties additionally have filed supplemental briefs in light of *Cullen v. Pinholster*,

563 U.S. ___, 131 S. Ct. 1388, 1398-1401, 179 L. Ed. 2d 557 (2011), which held that the

evidentiary record in a § 2254(d)(1) proceeding is "limited to the record that was before the state

court that adjudicated the claim on the merits."  *Id.*

## LEGAL STANDARD

The Court reviews the present petition for a writ of habeas corpus pursuant to the

standards set forth in 28 U.S.C. §§ 2241 and 2254.  Section 2241 contains a grant of general

jurisdiction to federal courts to issue writs of habeas corpus to individuals being held by a state

"in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c);

*see also I.N.S. v. St. Cyr*, 533 U.S. 289, 314, 121 S. Ct. 2271, 150 L. Ed. 2d 347 (2001);

---

[4]  As the Seventh Circuit noted in a related case:  "To say that Lieberman challenged the
State of Illinois' petition to have him civilly committed would be an understatement.  Since
2000, Lieberman has simultaneously sought relief in the courts of no less than three Illinois
counties and in one federal district court."  *Lieberman v. Thomas*, 505 F.3d 665, 666 (7th Cir.
2007) (rejecting, as unexhausted and without merit, Lieberman's habeas claim that the state
denied him a right to a timely probable cause hearing after the state filed its civil commitment
petition).  Respondent does not contend that any of these prior proceedings implicate the bar to
second or successive habeas petitions under 28 U.S.C. § 2244(b).  (R. 22, Answer to Petition for
a Writ of Habeas Corpus ("Ans.") at 5 (citing *Magwood v. Patterson*, 561 U.S. ___, 130 S. Ct.
2788, 2796, 177 L. Ed. 2d 592 (2010).)

*Kholyavskiy v. Achim*, 443 F.3d 946, 952 (7th Cir. 2006). Until most recently, federal courts

would exercise their "independent judgment when deciding both questions of constitutional law

and mixed constitutional questions, . . . ow[ing] no deference to a state court's resolution of such

questions of law or mixed questions." *Williams v. Taylor*, 529 U.S. 362, 400, 120 S. Ct. 1495,

146 L. Ed. 2d 389 (2000) (O'Connor, J., concurring).

      With the enactment of the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), codified at 28 U.S.C. § 2254, Congress tempered the traditional broad equitable

power of federal courts to issue writs of habeas corpus to individuals in state custody. *See, e.g.*,

*Greene v. Fisher*, 565 U.S. ___, No. 10–637 (Nov. 8, 2011); *Harrington v. Richter*, 562 U.S.

___, 131 S. Ct. 770, 787, 78 L. Ed. 2d 624 (2011). Under AEDPA, the "successful petitioner"

must still "demonstrate that he 'is in custody in violation of the Constitution or laws or treaties of

the United States,'" *Brown v. Watters*, 599 F.3d 602, 611 (7th Cir. 2010) (quoting 28 U.S.C. §

2254(a)), but now must also satisfy a complex and highly deferential standard, codified at 28

U.S.C. §§ 2254(b)-(e), that the Supreme Court has described as "difficult to meet." *Harrington,*

131 S. Ct. at 786.

      In all claims governed by AEDPA, "a determination of a factual issue made by a State

court shall be presumed to be correct. The applicant shall have the burden of rebutting the

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

      Section 2254(b) imposes a requirement of exhaustion, namely that a petitioner must "first

attempt to present his claim in state court." *Harrington*, 131 S. Ct. at 787. As the Supreme

Court has explained, a habeas petitioner must fully and fairly present his federal claims through

one full round of state court review before filing a federal habeas petition. *See O'Sullivan v.*

13

*Boerckel,* 526 U.S. 838, 845, 848, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); *Gray v. Hardy,* 598

F.3d 324, 327 (7th Cir. 2010). The purpose of the exhaustion requirement is to provide the state

courts with an "'opportunity to pass upon and correct' alleged violations of its prisoners' federal

rights.'" *Cheeks v. Gaetz,* 571 F.3d 680, 685 (7th Cir. 2009) (internal citations omitted).

Even if a petitioner otherwise exhausts his state court remedies, AEDPA imposes

significant additional obstacles to federal habeas review. *See, e.g.*, *Harrington*, 131 S. Ct. at

786. First, if the state court "reject[ed] the claim on procedural grounds" during the state

appellate review process, then the claim will be "barred in federal court" on the basis of

procedural default. *Id.*; *see also Cone v. Bell*, 556 U.S. ___, 129 S. Ct. 1769, 1780, 173 L. Ed.

2d 701 (2009) ("[W]hen a petitioner fails to raise his federal claims in compliance with relevant

state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an

independent and adequate state ground for denying federal review."). A habeas petitioner may

overcome procedural default only by demonstrating cause for and actual prejudice from the

default, *see House v. Bell,* 547 U.S. 518, 536, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006), or that

failure to consider the claim would result in a fundamental miscarriage of justice, such as the

"conviction of one who is actually innocent." *Murray v. Carrier,* 477 U.S. 478, 496, 106 S. Ct.

2639, 91 L. Ed. 2d 397 (1986).

Second, if the state court adjudicated the petitioner's federal claim on the merits, the

claim is still barred in federal court unless the petitioner can satisfy either of two exceptions to

the claim bar of § 2254(d). *See Harrington*, 131 S. Ct. at 786. Under § 2254(d), commonly

referred to as AEDPA's "relitigation bar," a petition for writ of habeas corpus "on behalf of a

person in custody pursuant to the judgment of a State court shall not be granted with respect to

any claim that was adjudicated on the merits in State court proceedings unless the adjudication

of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §§ 2254(d)(1), (2); *see also Cullen*, 131 S. Ct. at 1398-1401 (holding that the

evidentiary record in a § 2254(d)(1) proceeding is "limited to the record that was before the state

court that adjudicated the claim on the merits"); *Williams*, 529 U.S. at 402-03.

With regard to § 2254(d)(1), "clearly established federal law" refers to the law at the time

of the last state court adjudication on the merits. *See, e.g., Greene*, No. 10-637, 565 U.S. ___

(Nov. 8, 2011); *Cullen*, 131 S. Ct. at 1398 (noting that AEDPA uses "backward-looking

language"). The Supreme Court has explained that a state court decision is "contrary to . . .

clearly established federal law" if it "contradicts the governing law set forth in our cases," or

"the state court confronts a set of facts that are materially indistinguishable from a decision of

this Court and nevertheless arrives at a result different from our precedent." *Williams*, 529 U.S.

at 405-06.

A state court decision involves an "unreasonable application of . . . clearly established

federal law" if it "correctly identifies the governing legal rule but applies it unreasonably to the

facts of a particular prisoner's case," *id.* at 407–08, "but not when the state court merely applies

federal law 'erroneously or incorrectly.'" *Collins v. Gaetz*, 612 F.3d 574, 585 (7th Cir. 2010)

(quoting *Williams*, 529 U.S. at 411); *see also Morgan*, 2011 WL 5319665, at *4 (noting that the

inquiry is objective, and "a state court's decision is objectively unreasonable if it falls well

outside the boundaries of permissible differences of opinion") (internal citation and quotation marks omitted).

## DISCUSSION

In this case, Petitioner argues that he is being held in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, *see* U.S. Const. amend. XIV, and the Ex Post Facto Clause of the United States Constitution, *see id.,* art. I, § 10. The parties agree that the relevant decision for purposes of the Court's review under AEDPA comes from the last state court to reach the merits of Petitioner's claims – the 2007 decision of the Illinois Appellate Court that affirmed the state trial court's order of civil commitment. *See In re Lieberman*, 379 Ill. App. 3d 585, 586, 884 N.E.2d 160, 318 Ill. Dec. 605 (Ill. App. Ct. 2007).

Petitioner presents four independent claims for relief. The Court addresses each in turn.

## I.      Claim I – Due Process

In his first claim, Petitioner contends that the state court erred in ordering his civil confinement, where "the uncontroverted evidence demonstrates that [Petitioner] does not suffer from lack of volitional control." (Pet. at 9.) Petitioner bases his claim on three decisions of the United States Supreme Court, which together constitute the "clearly established federal law" pursuant to which the Court will evaluate the decision of the Illinois appellate court. *See Kansas v. Crane*, 543 U.S. 407, 122 S. Ct. 867, 151 L. Ed. 2d (2002); *Kansas v. Hendricks*, 521 U.S. 346, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997); *Foucha v. Louisiana*, 504 U.S. 71, 82-83, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992).

### A.      Legal Standard

The Due Process Clause not only contains procedural guarantees, but it also guarantees

16

certain substantive rights. *See Foucha*, 504 U.S. at 80. One such guarantee is that no state shall order the civil commitment of any individual except "in certain narrow circumstances." *Id.* (emphasizing freedom from bodily restraint as the "core" of protected liberty). The three cases cited above – *Crane*, *Hendricks*, and *Foucha* – elucidate these narrow circumstances.

The first case, *Foucha v. Louisiana*, involved the indefinite detention of a defendant, Foucha, after he was found not guilty by reason of insanity. 504 U.S. at 80. In the proceedings before the Supreme Court, the state did not argue that the defendant was mentally ill, but rather, "that because Foucha once committed a criminal act and now has an antisocial personality that sometimes leads to aggressive conduct, a disorder for which there is no effective treatment, he may be held indefinitely." *Id.* at 82. The United States Supreme Court rejected that argument, reasoning that the state's "rationale would permit the State to hold indefinitely any other insanity acquittee not mentally ill who could be shown to have a personality disorder that may lead to criminal conduct." *Id.* The Court accordingly held that Foucha's confinement was unconstitutional, explaining that due process requires a showing of "current mental illness and dangerousness." *Id.* at 79 (further opining that the nature of the commitment must "bear some reasonable relation" to the purpose of the commitment). The Court explained that because "Foucha is not suffering from a mental disease of illness," he cannot be held as a mentally ill person. *Id.*

The next case, *Kansas v. Hendricks*, elaborated on the requirement of "mental illness." The case arose out of the civil confinement of Hendricks, who had been diagnosed with pedophilia and admitted that he was unable to control his urge to molest children. *See* 521 U.S. at 350-51. The Kansas Supreme Court invalidated his confinement because the state never found

Hendricks to have a "mental illness," as the court believed *Foucha* required, but instead

determined that he suffered from a "mental abnormality." *Id.* at 356. The Supreme Court

reversed, explaining that the phrase "'mental illness' is devoid of any talismanic significance,"

and that the diagnosis of pedophilia, a recognized mental disorder, plainly constitutes a mental

illness under *Foucha*. *Id.* at 359. The Supreme Court concluded that Henricks' diagnosis,

combined with his admitted lack of volitional control and opinions about his future

dangerousness, "adequately distinguishe[d] Hendricks from other dangerous persons who are

perhaps more properly dealt with exclusively through criminal proceedings." *Id.* at 360.

     In the most recent case, *Kansas v. Crane*, the Supreme Court considered whether, in

order to impose the civil confinement of a sex offender, the required mental condition must

involve a "complete loss of volitional control." 534 U.S. at 411. The Court answered that

question in the negative. *Id.* ("*Hendricks* set forth no requirement of a *total* or *complete* lack of

control.") (emphasis in original). In so holding, the Court did not set forth any "bright-line

rules" about volition, but rejected the argument that due process would permit "commitment of

the type of dangerous sexual offender considered in *Hendricks* without any lack-of-control

determination." *Id.* at 412. The Court then offered the following guidance:

> [A] critical distinguishing feature of [the] "serious . . . disorder" [in *Hendricks*]
> consisted of a special and serious lack of ability to control behavior. Recognizing
> that fact, we did not give to the phrase "lack of control" a particularly narrow or
> technical meaning. And we recognize that in cases where lack of control is at
> issue, "inability to control behavior" will not be demonstrable with mathematical
> precision. It is enough to say that there must be proof of serious difficulty in
> controlling behavior. And this, when viewed in light of such features of the case
> as the nature of the psychiatric diagnosis, and the severity of the mental
> abnormality itself, must be sufficient to distinguish the dangerous sexual offender
> whose serious mental illness, abnormality, or disorder subjects him to civil
> commitment from the dangerous but typical recidivist convicted in an ordinary
> criminal case.

*Id.* at 413.

Taken together, *Foucha*, *Hendricks*, and *Crane* emphasize the constitutional "necessity of distinguishing between the typical dangerous recidivist and the offender whose dangerousness is caused by some identifiable mental condition that impairs his ability to refrain from activity dangerous to others." *McGee v. Bartow*, 593 F.3d 556, 579 (7th Cir. 2010). A "finding of dangerousness, standing alone," will not satisfy due process, nor will a finding of mental impairment unconnected to volition and dangerousness. *Id.* (quoting *Hendricks*, 521 U.S. at 358). The proof instead will satisfy due process when the State has "coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'" *McGee*, 593 F.3d at 570; *see also Brown v. Watters*, 599 F.3d 602, 611-13 (7th Cir. 2010).

## B.    State Court Decision

Petitioner raised his present due process claim before the trial court, and then on direct appeal. The Illinois Court of Appeals was the last state court to adjudicate the claim on the merits, and rejected it for the following reasons:

> [W]e find that there was sufficient evidence presented to establish that [Petitioner] has serious difficulty controlling his sexually violent behavior. We initially note that although the jury is not required to make an explicit finding that [Petitioner] has serious difficulty controlling his sexual behavior . . . , such a finding is implicit in the jury's verdict in this case that [Petitioner] is a sexually violent person. . . . Based upon the [volitional components of the elements of a SVP], this court has also held that, in finding that someone is dangerous because he suffers from a mental disorder that makes it substantially probable that he will engage in future acts of sexual violence, the jury is necessarily required to find that the person lacks volitional control over his mental disorder.
>
> We also find that there was sufficient evidence presented at trial to support a finding that [Petitioner] lacks volitional control over his mental disorders. Initially, Dr. Leavitt's testimony alone was sufficient to support this conclusion.

19

Dr. Leavitt diagnosed [Petitioner] with paraphilia nos, cannabis abuse, and antisocial and narcissistic personality disorders. Dr. Leavitt testified that [Petitioner's] paraphilia affects his emotional and volitional capacity and predisposes him to commit future acts of sexual violence, and explained that [Petitioner's] other disorders act as disinhibiting influences that make it easier for him to commit sexually violent acts. According to Dr. Leavitt, [Petitioner] has refused to undergo treatment for his paraphilia, which is the only way to control that disorder, and shows a lack of empathy for his victims and a lack of remorse for his actions. In addition to his clinical judgment, Dr. Leavitt used actuarial instruments to confirm his opinion that [Petitioner's] mental disorders create a substantial probability that he will engage in future acts of sexual violence. Considering all of this testimony, we find that a jury could reasonably conclude that [Petitioner] has serious difficulty controlling his sexually violent behavior.

Dr. Buck's testimony also supports a finding that [Petitioner] has serious difficulty controlling his sexual behavior. Dr. Buck found that [Petitioner] suffers from the same disorders as were diagnosed by Dr. Leavitt, and she testified that those disorders impact [Petitioner's] emotional and volitional capacity and predispose him to commit future acts of sexual violence. Dr. Buck also noted that [Petitioner] has refused to undergo treatment for his disorders and that he lacks empathy for his victims. She added that [Petitioner] has refused to accept responsibility for his criminal offenses and that he blames his convictions on overzealous prosecutors and mistaken identity. Dr. Buck concluded that [Petitioner's] mental disorders make it substantially probable that he will commit future acts of sexual violence. Although Dr. Buck testified that [Petitioner] has volitional control, the jury was free to accept or reject as much or as little of her testimony as it saw fit. [Internal citation to state cases omitted.]

Moreover, Dr. Buck's testimony that [Petitioner] made a volitional choice to commit his sexual offenses does not preclude his commitment under the Act. [Internal citation omitted.] Dr. Buck testified that [Petitioner] is "free to do what he wants," in that he committed his sexual offenses intentionally and made a volitional choice to execute them. [Petitioner] seems to interpret this testimony to mean that he is able to control his sexually violent behavior and that, in effect, he could make a volitional choice to never again commit a sexually violent offense. However, such a conclusion does not follow from Dr. Buck's testimony. The mere fact that [Petitioner] intentionally committed his sexual offenses does not mean that he has the volitional capacity to choose not to commit them. Dr. Buck never offered such an opinion and in fact testified that there is a substantial probability that [Petitioner] will commit a future act of sexual violence. In this regard, Dr. Buck explained that [Petitioner's] mental disorders "warp his perceptions and his feeling and allow him to exhibit sexually assaulting behavior." Dr. Buck further explained that she was not aware of a means of measuring volitional capacity and that psychologists do not measure volitional

20

control as "high, low, up, [or] down."  Rather, in Dr. Buck's expert opinion, [Petitioner's] mental disorders impact his emotional and volitional capacity and predispose him to commit acts of sexual violence.  We conclude that Dr. Buck's statements regarding [Petitioner's] volitional control, when considered in context of her entire testimony, do not undermine the jury's verdict that [Petitioner] is a sexually violent person.  [Internal citation omitted.]

We disagree with [Petitioner] that Dr. Leavitt concurred with Dr. Buck's testimony that [Petitioner] has volitional control. [Petitioner's] claim is based on Dr. Leavitt's testimony that, by not sexually assaulting anyone while in prison, [Petitioner] demonstrated that he could control his behavior under certain circumstances.  However, Dr. Leavitt further explained that it was important to consider that [Petitioner] was incarcerated within a correctional facility during this time.  Dr. Buck similarly noted that the DOC is a "controlled environment" that goes "out of [its] way" to protect its female workers.  Under these circumstances, we do not read Dr. Leavitt's testimony to indicate that [Petitioner] has volitional control over his mental disorders or his sexually violent behavior.

[Petitioner] also claims that the State failed to prove beyond a reasonable doubt that he suffers from a mental disorder and that he is dangerous because that disorder creates a substantial probability that he will engage in future acts of sexual violence.  [Petitioner] asserts that the testimony of the State's experts was inconsistent and unsupported by admissible evidence, and therefore insufficient to sustain the jury's verdict.  We disagree.

The Act defines a mental disorder as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 1998).  In this case, Dr. Buck and Dr. Leavitt testified that [Petitioner] suffers from paraphilia nos, a congenital or acquired disorder that affects his emotional or volitional capacity and predisposes him to commit future acts of sexual violence.  Dr. Buck and Dr. Leavitt also diagnosed [Petitioner] with cannabis abuse and narcissistic and antisocial personality disorders.  Both witnesses concluded that [Petitioner's] mental disorders create a substantial probability that he will engage in future acts of sexual violence.  We conclude that this testimony was sufficient to support the jury's finding that [Petitioner] suffers from a mental disorder and that he is dangerous because that disorder creates a substantial probability that he will engage in future acts of sexual violence.  [Internal citation omitted.]

. . . . We find that [Petitioner's] claims amount to no more than an attack on the credibility of the witnesses and the weight to be given to their testimony.  In considering a challenge to the sufficiency of the evidence, it is not the function of this court to reweigh the evidence or retry [Petitioner].

Rather, the trier of fact, in this case the jury, is responsible for assessing the witnesses' credibility, weighing the testimony, and drawing reasonable inferences from the evidence. In this case, the record establishes that, at trial, [Petitioner] explored all of the alleged inadequacies in Dr. Buck's and Dr. Leavitt's opinions during a vigorous cross-examination of both witnesses and through the testimony of his own expert witnesses. In finding [Petitioner] to be a sexually violent person, the jury in this case implicitly found the testimony of Dr. Buck and Dr. Leavitt to be more credible and, after reviewing the record, we find no valid reason to substitute our judgement for that of the trier of fact. . . .

*Id.* (internal citations omitted).

### C.     Analysis

Petitioner's due process claim rests on an argument of insufficient evidence. *See*

*Addington v. Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979) (opining that the

"standard of proof" is a concept "embodied in the Due Process Clause"). Petitioner contends

that the evidence presented at trial failed to meet the minimum standards of due process required

by the Supreme Court because, in Petitioner's view, "the uncontroverted evidence in the record

shows that Lieberman does not currently lack volitional control over his behavior." (Pet. at 8.)

Petitioner explains that the "State's principal witness, Dr. Buck, repeatedly testified that

the Petitioner is not mentally ill and does not suffer from a lack of volitional control." (*Id.*)

Petitioner further proffers the testimony of Dr. Buck that "Petitioner is 'not mentally ill,' 'does

not have acute psychiatric problems,' 'has volitional control because he's not mentally ill,' and

that '[a]ll of his behavior over the past well documented 26 years screams he has volitional

control, volitional capacity, there is no doubt about that.'" (*Id.* (alteration in original).)

Petitioner also characterizes Dr. Leavitt's testimony as "agree[ing] that Petitioner is able to

"control his impulses.'" (*Id.*) Finally, Petitioner points to the testimony of one of his experts,

Dr. Lytton, who testified, as Petitioner explains, that "Petitioner has full volitional control; she

22

saw 'no evidence . . . that he lacked volitional control, that he couldn't control himself.'" (*Id.*)

The state courts adjudicated the present claim on the merits within the meaning of § 2254(d), and the claim is therefore subject to AEDPA's relitigation bar. To overcome the litigation bar, Petitioner must satisfy the standards set forth in either §§ 2254(d)(1) or 2254(d)(2). Although Petitioner's analysis fails to distinguish between the two subsections, he has failed to demonstrate his entitlement to habeas relief under either.

Petitioner's argument amounts to little more than an attack on the credibility of the witnesses at trial, and the weight accorded their testimony.[5] Such an argument must overcome an almost insurmountable burden. *See Murrell v. Frank*, 332 F.3d 1102, 1120 (7th Cir. 2003) ("[I]n the habeas corpus context, we cannot upset a factual finding of credibility by the state trial judge, without running afoul of applicable law."). The state appellate court expressly concluded, based on the trial testimony, "there was sufficient evidence presented" (1) "to establish that [Petitioner] has a serious difficulty controlling his sexually violent behavior;" and (2) "to support a finding that Petitioner lacks volitional control over his mental disorders," (3) to support "a finding that Petitioner has serious difficulty controlling his sexual behavior." Petitioner has not demonstrated by clear and convincing evidence that these factual findings were erroneous, or otherwise unsupported by the record. *See* 28 U.S.C. § 2254(e).

---

[5] Neither party argues that the state court applied an incorrect legal standard. In any event, the Court notes that the Illinois Appellate Court appears to have relied on Illinois case law that is consistent with the clearly established law discussed above. *See Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (stating that under the AEDPA, the state court need not cite nor be aware of the relevant Supreme Court precedent "so long as neither the reasoning nor the result of the state-court decision contradicts" established Supreme Court precedent).

Petitioner supports his argument with the testimony of Dr. Buck and Dr. Leavitt, but when read in context, the doctors' testimony provides no basis for relief under AEDPA. Beginning with Dr. Buck, although the doctor testified that Petitioner intentionally committed acts of sexual violence, such testimony does not undermine the constitutionality of Petitioner's civil confinement, particularly when viewed in light of the entirety of Dr. Buck's testimony. *See Crane*, 534 U.S. at 412 (noting that due process does not require complete lack of volition to impose civil confinement); *McGee*, 593 F.3d at 573 ("some inability to control behavior"). Whether Petitioner intentionally committed his acts of sexual violence is not the issue, as due process requires a finding that an "individual is dangerous because he suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." *McGee*, 593 F.3d at 573.

Dr. Buck testified that, to a reasonable degree of psychological certainty, Petitioner suffers from paraphilia nos, which has manifested itself in deviant sexual behavior, in addition to anti-social personality disorder and severe narcissistic personality disorder. (1/24/06 Tr., Test. of Dr. Buck at 107-08, 115-22, 127 (further opining that Petitioner is a "psychio path").) According to Dr. Buck, Petitioner's mental disorders "warp his perceptions and his feelings and allow him to exhibit sexually assaulting behavior." (1/31/06 Tr. at 102.) These "disorders impact [Petitioner's] emotional and volitional capacity," predisposing him and making it substantially more probable that he will commit future acts of sexual violence." *In re Lieberman*, 379 Ill. App. 3d at 591-92; (*see also* 1/24/06 Tr., Test. of Dr. Buck at 112 (testifying that Petitioner's paraphilia "does" impact his emotional or volitional capacity).)

Dr. Buck also noted that Petitioner has refused to undergo treatment, and, in her opinion,

24

treatment is the only effective way to control Petitioner's mental disorders. (*See, e.g.*, 1/24/06

Tr., Test. of Dr. Buck at 69, 110 ("These are very deep seeded problems, and the earlier the onset

of this kind of behavior the more difficult it is to treat. And sitting behind bars doesn't make that

go away.").) The doctor also relied on a sex offender risk assessment, including the Minnesota

Sex Offender screening tool, which showed that Petitioner had a high probability of future

sexual deviant behavior. (*Id.* at 124-26 (testifying that Petitioner scored very high on each of the

risk assessment tests).) In the end, Dr. Buck summarized her findings as follows:

> It is my opinion within a reasonable degree of psychological certainty, that Mr.
> Lieberman suffers from paraphilia not otherwise specified, sexually attracted to
> nonconsenting persons, cannabis abuse, narcissistic personality disorder severe,
> and antisocial personality disorder, and that these conditions are both congenial
> and acquired, and they affect his cognitive and volitional capacity which
> predispose him to commit additional agents of sexual violence. Since he is
> untreated in terms of sexual offender treatment and the actuarial tools, along with
> my clinical evaluation and my review of all of these materials that we have talked
> about, I believe that should he be released to the community at this time it is
> substantially probable that he would continue to commit acts of sexual violence.

(*Id.* at 129-30.)

With regard to Dr. Leavitt, Petitioner contends that the doctor "agreed that Petitioner is

able to 'control his impulses.'" (Pet. at 12.) This is a mischaracterization of Dr. Leavitt's

testimony. Dr. Leavitt testified that "in certain situations, in most situations in the last 26 years

he's able to control his impulses." (2/6/06 Tr. at 174.) These 26 years refer to the time

Petitioner has been confined in a controlled environment, so, as the doctor explained, Petitioner's

apparent ability to control his behavior has limited value.

Additionally, Dr. Leavitt testified that he diagnoses Petitioner with numerous medical

conditions, including paraphilia nos, cannabis abuse, and antisocial and narcissistic personality

disorder. (2/6/06 Tr., Test. of Dr. Leavitt, at 56-61.) Dr. Leavitt opined that, based on his

25

clinical judgment and a review of relevant records, Petitioner's paraphilia specifically affects his volition and predisposes him to commit acts of sexual violence. (*Id.* at 61 ("It is my opinion that[, "in 1980 as well as today,"] as a result of the paraphilia nos[,] that this condition does predispose Mr. Lieberman to commit future acts of sexually violent behavior.").) Like Dr. Buck, Dr. Leavitt found significant Petitioner's refusal to undergo treatment, testifying that Petitioner has rejected the only avenue to control his deviant sexual behavior. (*See id.* at 29, 83.)

Beyond his clinical judgment and review of the record, Dr. Leavitt relied on various "actuarial instruments to confirm his opinion that [the] mental disorders create a substantial probability that [Petitioner] will engage in future acts of sexual violence." *In re Lieberman*, 379 Ill. App. 3d at 592-93; (*see also* 2/6/06 Tr., Test. of Dr. Leavitt at 69-83 (testimony as to the value of actuarial instruments in complementing clinical judgment, and specifics of the doctor's actual findings based on the instruments).) Although Petitioner characterizes the actuarial instruments as tantamount to "junk science," the Seventh Circuit has recognized the evidentiary value of such instruments in predicting recidivism, particularly where, as here, the instruments are used in combination with other assessment tools, including clinical judgment. *See, e.g.*, *United States v. McIlrath*, 512 F.3d 421, 425 (7th Cir. 2008) (noting the predicative power of actuarial tools when used properly and in combination with other measures).

In light of the state court record, and based on a review of the state court adjudication, Petitioner has failed to demonstrate his entitlement to relief under AEDPA on his due process claim. *See* 28 U.S.C. § 2254(d). Even if the state court erred in its ultimate conclusion, Petitioner has not shown that the state court adjudication was contrary to or involved an unreasonable application of clearly established federal law, nor has Petitioner shown that the

adjudication was premised on an unreasonable determination of the facts that resulted in an error of constitutional dimension.  *See* 28 U.S.C. §§ 2254(d)(1), (2).  Based on the record below, the state court had sufficient evidence to distinguish Petitioner from the "typical recidivist convicted in an ordinary criminal case."  *Crane*, 534 U.S. at 413.

Accordingly, the Court denies Petitioner's application for a writ of habeas corpus, with prejudice, as to Claim I.

## II.    Claim II – Ex Post Facto Clause

In his second claim, Petitioner argues that his "continued confinement is based solely on his past crimes" in violation of the Ex Post Facto Clause of the United States Constitution.  (Pet. at 12.)  Although not well articulated, Petitioner appears to argue that his confinement was punitive, and not for the purpose of incapacitation.

The Ex Post Facto Clause of the United States Constitution "'forbids the application of any new punitive measure to a crime already consummated,' [which] has been interpreted to pertain exclusively to penal statutes."  *Hendricks*, 521 U.S. at 370 (quoting *California Dep't of Corr. v. Morales*, 514 U.S. 499, 505, 115 S. Ct. 1597, 1601, 131 L. Ed. 2d 588 (1995) (quoting *Lindsey v. Washington*, 301 U.S. 397, 401, 57 S. Ct. 797, 799, 81 L. Ed. 1182 (1937)).  In *Hendricks*, the Supreme Court rejected an *ex post facto* challenge to an act similar to the SVPCA, reasoning that it was not punitive and did not have retroactive effect.  521 U.S. at 370-71.

In this case, similar to *Hendricks*, Petitioner has not shown that the proceedings were punitive in nature or otherwise had retroactive effect in violation of the Ex Post Facto Clause. The Illinois Appellate Court found that "Dr. Buck and Dr. Leavitt did not rely solely upon

[Petitioner's] past crimes or actuarial instruments in arriving at their opinions," explaining:

> Either one or both witnesses also relied upon clinical judgment, a clinical interview with [Petitioner], [Petitioner's] mental-disorder diagnoses and refusal to undergo treatment, and a review of [Petitioner's] master file, which included prior mental health evaluations by DOC and DHS personnel and documents relating to [Petitioner's] disciplinary history and behavior while incarcerated and in civil detention.

*Id.* at 603. This factual finding has ample record support (*see, e.g.,* 1/24/06, Test. of Dr. Buck at 60-122; 2/6/06 Tr., Test. of Dr. Leavitt at 27-30), and Petitioner does not argue, or attempt to show, that these specific factual findings were clearly erroneous or unreasonable, or that the state court adjudication otherwise was contrary to or involved an unreasonable application of federal law. *See* 28 U.S.C. §§ 2254(d)(1), (2). Nor does Petitioner point to any decision of the United States Supreme Court to which the adjudication was "contrary to" or "an unreasonable application of." *Id.* To the extent the State's experts relied upon Petitioner's prior conduct, the experts, as in *Hendricks*, used "such conduct . . . solely for evidentiary purposes, either to demonstrate that a "mental abnormality" exists or to support a finding of future dangerousness." *Hendricks*, 521 U.S. at 362; (*see also* 1/24/06 Tr. at 72, Test. of Dr. Buck (noting the relevance of past crimes to predictions about future behavior).)

Accordingly, the Court denies Petitioner's application for a writ of habeas corpus, with prejudice, as to Claim II.

## III.    Claim III – Newly Discovered Evidence Regarding Actuarial Tools

In his third claim for relief, Petitioner maintains that he is being held in violation of his rights to due process based on newly discovered evidence that undermines the validity of the actuarial tools used at trial, namely "the Static-99 and MnSOST-R risk assessment tools." (Pet. at 15.) Specifically, Petitioner argues that the state court violated his due process rights by

"relying on actuarial risk assessment 'tools, mainly the 'static-99' and the 'MnSOST-T,'' to argue[] that [he] was substantially probable to commit another sexual offense if released from custody." (*Id.* at 9).

In approaching the present claim, Petitioner has not made clear whether he is challenging the sufficiency of the evidence at trial based on the use of the actuarial tools – a claim adjudicated on the merits by the state court – or whether he is challenging the use of certain actuarial tools as itself an independent violation of due process, a claim not raised before the state court. Either way, the Court cannot grant Petitioner relief consistent with AEDPA.

With regard to the sufficiency of the evidence adduced at trial, Petitioner contends that "newly discovered evidence" – consisting of academic studies, communications, and a psychiatric evaluation – debunks the validity of risk assessment evidence presented at trial and relied upon by the state courts, thereby depriving the judgment of sufficient evidence in violation of due process. As the parties recognize, the Illinois state appellate court rejected Petitioner's claim of insufficiency of the evidence on the merits. Therefore, AEDPA bars relief unless Petitioner can show that the decision of the state court involved an unreasonable application or was contrary to clearly established federal law, or was based on an unreasonable determination of fact. 28 U.S.C. § 2254(d).

Petitioner has not made any such showing. Nor can he. The Supreme Court has made clear that review "under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 131 S. Ct. at 1389. The relevant inquiry is backward looking, and the Court must look to the propriety of the state court adjudication at the time it occurred. For this reason, the proffered "newly discovered evidence" is irrelevant to the

29

question of whether this Court may reach the merits of Petitioner's claim under § 2254(d). *See, e.g.*, *Price v. Thurmer*, 637 F.3d 831, 837 (7th Cir. 2011). Because Petitioner points to no evidence in the state court record in an attempt to "demonstrate how the state appellate court's opinion conflicts with, or unreasonably applied, relevant Supreme Court precedent, nor does he show how the court's decision rested on unreasonable factual determinations, as required by AEDPA," his claim is barred by AEDPA. *See* 28 U.S.C. § 2254(d).

To the extent Petitioner seeks to assert a new claim that the use of the actuarial tools at trial violated his due process rights, that claim likewise fails. AEDPA requires a petitioner to exhaust his state court remedies prior to seeking federal habeas relief. *See, e.g.*, *Socha v. Pollard*, 621 F.3d 667, 671 (7th Cir. 2010) (citing 28 U.S.C. § 2254(b)(1)(A)). Petitioner admittedly has not done so, thus depriving the state court of "an opportunity to resolve [his claim] by invoking one complete round of the state's established appellate review process.'" *Byers v. Basinger*, 610 F.3d 980, 985 (7th Cir. 2010) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999)).

Petitioner asks the Court to excuse his apparent failure to exhaust his claim, arguing that he "has no State remedy for the Due Process violation that occurred here." (Pet. at 18.) According to Petitioner, neither the Illinois Post Conviction Hearing Act, 725 ILCS 5/122-2, the Illinois Habeas Corpus Act, 735 ILCS 5/10/101, nor the Relief from Judgment Act, 735 ILCS 5/2-1401, are available to him "under the circumstances of this case." (Pet. at 18.) Even if Petitioner is correct, he nonetheless has other avenues to assert his claim. To the extent Petitioner seeks to attack the original judgement of civil commitment on the basis of new

evidence, Section 2-1401 of the Illinois Code of Civil Procedure would permit him to do so.[6]
*See People v. Lawson*, 212 Ill. 2d 285, 334, 818 N.E.2d 326, 288 Ill. Dec. 638 (2004).

To the extent Petitioner seeks to challenge his *continued* confinement in light of the new
evidence, Petitioner must first avail himself of the appropriate state procedures for doing so. The
SVPCA provides that "[a]ny person who is committed for institutional care in a secure facility
may petition the committing court to modify its order by authorizing conditional release . . . . "
725 ILCS 207/60; *see also* 725 ILCS 207/65-70. Additionally, the Act requires the State to
conduct a periodic reexamination of the appropriateness of Petitioner's continued confinement.
725 ILCS 207/55(a). As Respondent points out, it appears that Petitioner is presently availing
himself of some of these procedures.

Specifically, on October 29, 2007, the State filed a motion in the Circuit Court of Cook
County, seeking a finding that there was no probable cause to believe that Petitioner should be
released from confinement. Petitioner filed his own petition on July 15, 2008, seeking
immediate, or alternatively conditional discharge, from custody. *See In re Detention of
Lieberman*, 955 N.E.2d 118, 352 Ill. Dec. 942 (Ill. App. Ct. 2011). Following a probable cause
hearing pursuant to the SVPCA, the trial court denied Petitioner's request for relief. *Id.* at 131.
The Illinois intermediate appellate court ultimately affirmed on June 30, 2011. Most recently, on
November 30, 2011, the Illinois Supreme Court granted Petitioner leave to appeal. *In re*

---

[6] The Court acknowledges that Section 2-1401 imposes a two year statute of
limitations, subject to limited exception. 735 ILCS 5/2–1401. Any such time bar does not alter
the Court's conclusion that the state provides a state procedural vehicle to bring a collateral
attack on a judgment of civil confinement. The proper course of action is for Petitioner to first
present his claim in state court via the appropriate procedural vehicle, regardless of how the state
courts may dispose of that proceeding, and then to seek federal habeas relief, if he chooses to do
so, subject to the ordinary rules governing federal habeas corpus.

*Detention of Brad Lieberman*, No. 112802 (Ill. Sup. Ct. Nov. 30, 2011) (granting petition for

leave to appeal). Subject to the ordinary rules governing federal habeas corpus, Petition may

seek habeas review, if at all, once the decision of the Illinois courts becomes final. *See, e.g.*,

*Murillo v. Frank*, 402 F.3d 786, 788 (7th Cir. 2005) (noting that a decision becomes final at "the

conclusion of direct review").

Accordingly, the Court denies Claim III, with prejudice, to the extent Petitioner

challenges the sufficiency of the evidence presented at trial. The Court also denies Claim III,

without prejudice, to the extent it seeks to challenge Petitioner's *continued* confinement or

otherwise challenge the State's use of certain actuarial tools in light of new evidence, as an

independent due process violation. *See* 28 U.S.C. §§ 2254(b), (c).

## IV.    Claim IV – Ex Post Facto Clause

In his final claim for relief, Petitioner argues that "retroactive application of the SVCPA

violates" his rights under the Due Process Clause of the Fourteenth Amendment to the United

States Constitution, and the Ex Post Facto Clause of the United States Constitution. He explains

as follows:

> [T]he SVPCA was retroactively applied to Lieberman because he should have
> been released on April 20, 1997, well before the January 1, 1998 effective date of
> the Act. The State could not have filed a timely Petition after the corrected
> release date because the SVPCA petition must be filed within 90 days before
> discharge or release. The Appellate Court nevertheless allowed the
> unconstitutional retroactive application of the SVPCA when it misperceived the
> simple mathematical calculation demonstrating that the Petitioner should have
> been released from prison on April 10, 1997. The decision of the Appellate Court
> to ignore Petitioner's proper release date and retroactively apply the SVPCA was
> a violation of the Ex Post Facto [C]lause and Due Process Clause of the United
> States Constitution.

(Pet. at 19 (internal paragraph break and citations omitted).)

Petitioner raised the same claim on direct appeal, but the state appellate court concluded that Petitioner "waived" the claim "by failing to comply with Supreme Court Rule 341(h)(7)," which "requires [an] appellant's brief to include argument . . . contain[ing] the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on."[7] *In re Detention of Lieberman*, 379 Ill. App. 3d at 610 (internal citations and quotation marks omitted). The court further explained that Petitioner "failed to adequately cite to the record or pertinent authority or to explain the basis of his conclusion that his release date should be April 10, 1997." *Id.*

Here, because the state appellate court concluded that Petitioner waived his claim, the claim is procedurally defaulted. It is well settled that failure to comply with state a procedural rule, such as Illinois Supreme Court Rule 341, "constitutes an independent and adequate state ground that bars federal habeas corpus review." *Dolis v. Gilson*, No. 07 C 1816, 2009 WL 5166228 (N.D. Ill. Dec. 23, 2009) (citing *Szabo v. Walls*, 313 F.3d 392, 395 (7th Cir. 2002); *see also Aliwoli v. Gilmore*, 127 F.3d 632, 634 (7th Cir. 1997) ("If a claim is found to be waived by an Illinois appellate court, that constitutes an independent and adequate state ground and we will not entertain that claim."). In the absence of any argument that the Court should excuse the

---

[7] Illinois Supreme Court Rule 341(h)(7) states that the appellant's brief "shall contain . . . [a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on. Evidence shall not be copied at length, but reference shall be made to the pages of the record on appeal or abstract, if any, where evidence may be found. Citation of numerous authorities in support of the same point is not favored. Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."

33

default,[8] Petitioner has not demonstrated his entitlement to federal habeas relief on Claim IV. *See, e.g.*, *Walker v. Martin*, 562 U.S. ___, 131 S. Ct. 1120, 1127-28 (2011); *Kerr v. Thurmer*, 639 F.3d 315, 323 (7th Cir. 2011).

Accordingly, the Court denies Petitioner's application for a writ of habeas corpus, with prejudice, as to Claim IV.

## V.     Certificate of Appealability

Under the 2009 Amendments to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, the Court must determine whether to grant Petitioner a certificate of appealability as to any of his claims pursuant to 28 U.S.C. § 2253(c)(2).

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition, instead, he must first request a certificate of appealability. *See Miller-El v. Cockrell*, 537 U.S. 322, 335, 123 S. Ct. 1029, 1039, 154 L. Ed. 2d 931 (2003); *Sandoval v. United States*, 574 F.3d 847, 852 (7th Cir. 2009). A habeas petitioner is entitled to a certificate

---

[8] Petitioner's only argument to excuse his default is contained in an unexplained footnote in the Petition, in which he asserts that the state court erred in finding waiver because he properly presented the claim in his appellant brief. (Pet. at 19 n. 2.) This argument is likely waived, *see Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009) ("A party may waive an argument by disputing a district court's ruling in a footnote or a one-sentence assertion that lacks citation to record evidence."), but even if it were not, federal courts do not sit in review of a state court's application of its own state law, absent extraordinary circumstances not argued here. *See, e.g.*, *Swarthout v. Cooke*, 131 S. Ct. 859 ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (internal citations and quotation marks omitted); *Curtis v. Montgomery*, 552 F.3d 578, 582 (7th Cir. 2009) ("We may not review state-court interpretations of state law."); *McCloud v. Deppisch*, 409 F.3d 869, 874-75 (7th Cir. 2005) (holding that "State law errors normally are not cognizable in habeas proceedings" even if "the state court's interpretation of state law happens to be central to" a federal claim).

of appealability only if he can make a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2); *Miller-El*, 537 U.S. at 336; *Narvaez v. United States*, 641 F.3d 877, 881 (7th Cir. 2011). Under this standard, Petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000)).

Here, jurists of reasons would not debate the Court's conclusion that Petitioner has failed to demonstrate his entitlement to relief, consistent with AEDPA, on any of his claims. Petitioner has not made a substantial showing of the denial of a constitutional right under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, or the Ex Post Facto Clause of the United States Constitution. *See Miller-El*, 537 U.S. at 336. For these reasons, the Court declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For the reasons explained above, the Court denies Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. §§ 2241 and 2254, and declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

Dated: December 8, 2011

**ENTERED**

**AMY J. ST. EVE**
**United States District Judge**

35